IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

v.  CASE NO.: CR209-49

BENNIE SAMS, JR.
ERICA L. JACKSON
JOY L. WASHINGTON

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Joy Washington ("Washington") has been charged with conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846; possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); and aiding and abetting, in violation of 18 U.S.C. § 2. Washington filed two (2) Motions to Suppress, to which the Government responded. The undersigned conducted an evidentiary hearing on April 5, 2010, at which Investigator Eric Melendez, Hank Scott, and Timothy Williams testified. Washington filed two (2) post-hearing Briefs. The Government responded. For the reasons which follow, Washington's Motions should be **DENIED**.

## FINDINGS OF FACT

The credible testimony given at the evidentiary hearing establishes the following:

The Glynn-Brunswick Narcotics Enforcement Team ("GBNET") began receiving information regarding Washington's co-Defendant Bennie Sams ("Sams") in 2008.

Investigator Eric Melendez ("Melendez") became involved in this investigation during 2009, and a confidential information ("CI") had been providing Melendez with information on Sams. Melendez stated that, to his knowledge, Sams was living at 327 Nottingham Drive in Brunswick, Georgia, in April 2009. The CI informed Melendez around the first of April 2009 that a shipment of narcotics was to be delivered to that address around April 17, 2009. The CI also informed Melendez that either a black male named Jeff or his wife, a black female named Joy, would be driving a rental car from Florida to Brunswick, and the driver of this car would be in possession of 200 to 300 pieces of crack cocaine. Based on this information, Melendez and Sergeant Elliot ("Elliot") started surveilling the residence the week he received this information. The CI told Melendez that the narcotics shipment was due to arrive at 327 Nottingham Drive around 3:00 p.m. on April 17th. Melendez testified that he and Elliot began surveillance of the residence about 1:00 p.m. that day and were parked about 150 to 200 feet away from the residence and could see the front of the house. Around 3:00 p.m., Melendez saw a black female, who was later determined to be Washington, drive up to the residence in a white car. Melendez stated that Washington got out of the car, walked to the trunk, grabbed a bag out of the trunk, and walked toward the front door of the residence. Melendez also stated that a few minutes later, Washington walked back from the house to the car and got back into the car. Washington backed out of the driveway, and Melendez and Elliot began following the car. Melendez spoke with the shift supervisor, Sergeant Lodise, about having an officer driving a marked patrol car stop Washington's car. Melendez testified that Sergeant Lodise was able to follow Washington's car into the local Wal-mart parking lot, where she parked for a minute or

2

so and then returned to 327 Nottingham Drive. Once Washington came back to that address, Melendez testified that Washington again got out of the car, went to the trunk, removed a bag, and walked toward the front door of the residence. Melendez testified that Washington was again in the house for a few minutes, got back into the car, and drove away. Melendez stated that, based on his training, knowledge, and experience, he believed a drug transaction had occurred, and he informed other officers to pick up the surveillance of Washington's vehicle. Melendez specifically stated that Officer Hank Scott ("Scott"), who was a canine officer in Glynn County at that time, was instructed to initiate a traffic stop once Washington's vehicle turned southbound onto Interstate 95.

Scott testified that he got behind the white Mitsubishi Galant which Washington was driving and noticed that the car crossed over the outside fog line four (4) times. Scott testified that he stopped Washington for failure to maintain her lane at that point, and she told him she was eating her lunch causing her to cross over the fog line. (Hr'g Tr., p. 68). Scott testified that Washington appeared to be nervous. Scott stated that Sergeant Lodise was also at the scene of the traffic stop, and Scott asked Lodise to issue Washington a written warning for failure to maintain her lane. As Lodise was writing Washington a warning, Scott deployed his canine partner, Boxi, and he gave a positive indication[1] for the odor of narcotics[2] on the passenger-side door handle of Washington's car. Scott asked Washington if she had anything illegal in her car, and she said she did not. Scott then asked Washington if she had any guns, drugs, or large amounts of currency; Washington hesitated, but then told Scott she had about $7,000 in

---

[1] Scott testified that, when Boxi sniffed the passenger-side front door handle, "his body posture changed, he came up, he sucked in. I could hear his breathing changed and then he sat, which is a final indication [for the presence of narcotics]." (Hr'g Tr., p. 77).

[2] Scott stated that Boxi was trained to detect marijuana, cocaine (HCL and base), heroin, and MDMA.

3

a case in the trunk of the car. Scott testified that Washington had her cell phone in her hand, and he took the phone to look at the messages on it. Scott declared that he was checking the cell phone for messages or any other evidence relating to the investigation of drug activity. Scott also declared that people involved in criminal activities commonly use cell phones to communicate with each other. Scott testified that Washington was arrested and placed in the back of a police car after unmarked prescription narcotics were found in her car. Washington's rental car and her cell phone were brought to the Glynn County Police Department and were checked more thoroughly than they were at the scene of the traffic stop. Scott stated that one text message on Washington's cell phone stood out to him: "[H]e gave me $15,300; he still owes me $2810. He got 189." (Id. at p. 74).

Investigator Tim Williams ("Williams") was also at the scene of the traffic stop, arriving as Washington was getting out of the car. Williams assisted Scott in searching the car, and he found a black canvas bag with clothes and a pink towel wrapped around a plastic bag. Williams stated that there was $15,300 in this plastic bag. Williams testified that, when he opened the black bag and lifted the clothes off the top of the towel, there was a very strong odor of cocaine, which "almost knocked [him] back[.]" (Id. at p. 94).

Washington asserts that the search of her car was conducted without a warrant and was not supported by probable cause. Washington also asserts that the search of her cell phone was improper, and any evidence police obtained as a result of this search should be suppressed.

4

## DISCUSSION AND CITATION TO AUTHORITY

I. **The Search of Washington's Car**

Washington contends that, although the vehicle she was driving was mobile and operational, police officers did not have probable cause to believe the car contained contraband or evidence of a crime. Thus, Washington contends, the facts of this case do not fall within the automobile exception to the warrant requirement. Washington asserts that the drug dog conducted a "free air" sniff around her vehicle, but probable cause has not been established because the Government cannot show the dog's reliability in detecting narcotics. Washington alleges that the use of the drug dog in this case was improper.

The Government avers that, even before the canine detected the odor of narcotics on the passenger side door handle, officers had probable cause to search Washington's vehicle for contraband or evidence of a crime based on the totality of the circumstances. The Government contends that Scott made a traffic stop of Washington's car, confirmed her identity based on information Melendez had provided about possible criminal activity, and noticed Washington's nervous behavior. The Government contends that, when Boxi alerted on the passenger-side door handle, it only confirmed the existence of probable cause to search the car. The Government alleges that Boxi was a certified drug dog before Scott became his handler, Boxi never indicated a false positive for narcotics, and Boxi was not trained to alert to the odor of food.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. CONST. amend. IV. A warrantless search is *per se* unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions." Holmes v. Kucynda, 321 F.3d 1069, 1082 (11th Cir. 2003) (citing Mincey v. Arizona, 437 U.S. 385 (1978)).

The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search. United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003). "The requirement of mobility is satisfied merely if the automobile is operational." Id. Additionally, "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure or that other 'exigent circumstances' exist." United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). The key is "whether the police had probable cause for the search and seizure of the vehicle." Id. "Probable cause, in turn, exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." Id. (internal citations omitted). In cases involving the use of a narcotics dog, the Eleventh Circuit Court of Appeals "'has recognized that probable cause arises when a drug-trained canine alerts to drugs.'" United States v. Anderson, No. 09-12154, 2010 WL 597230, at *2 (11th Cir. Feb. 22, 2010) (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993)). The Eleventh Circuit has "held in dicta 'that training of a dog alone is sufficient proof of reliability.'" Id. (quoting United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982)).

AO 72A
(Rev. 8/82)

In this case[3], Scott was aware that Washington left a residence where officers believed drug transactions had occurred. Scott initiated a traffic stop based on Washington's failure to maintain her lane and noticed Washington's nervous behavior.[4] While Lodise was in the process of issuing Washington a written warning, Scott deployed his canine partner, Boxi. Boxi gave an alert for the presence of narcotics at the passenger-side door handle. Scott then asked Washington, inter alia, if she had a large amount of currency in the car, and, after some hesitation, she admitted to having about $7,000 in cash in the car.

Scott testified that Boxi was certified in narcotics tracking and detection prior to the two of them becoming partners. Scott also testified that he and Boxi attended a six (6) week intensive training program with the Jacksonville, Florida, Sheriff's Office, which ended at the end of February/beginning of March 2009. Scott stated that Boxi was trained to detect five (5) types of narcotics and that he was not aware of any occasion when Boxi alerted which turned out to be a false positive. (Hr'g Tr., pp. 63-65). Scott declared that Boxi never alerted to the presence of food, and, in fact, during the certification process, a food item was placed in a "hide" to make sure he did not alert on the food. Scott testified that, though he could not give an accurate number, every time Boxi was deployed, there were narcotics inside the vehicle or the drivers of the car admitted there had been narcotics in the car to explain Boxi's indication. (Id. at p. 80).

---

[3] As Washington does not contest the validity of the traffic stop and concedes that the first part of the "automobile exception" was met, the undersigned focuses his analysis on whether probable cause existed to search Washington's car.

[4] Scott did not testify as to what specific behavior Washington displayed which indicated she was nervous, but there was no evidence provided at the hearing which called into question the credibility of Scott's assessment.

7

The evidence before the Court reveals that Boxi had been trained and certified to alert to the presence of five (5) narcotics—marijuana, heroin, cocaine (HDL and base), MDMA. There is no evidence that Boxi ever gave a false indication for the presence of narcotics on any occasion in which he was deployed. Police officers had probable cause to believe, under the totality of the circumstances, there was a "fair probability" that "evidence of a crime" would be found in Washington's car. Lindsey, 482 F.3d at 1293. This portion of Washington's Motion should be denied.

## II. The Searches of Washington's Cell Phone

Washington contends that the initial search of her cell phone was conducted without a warrant and that the exceptions to the warrant requirement are inapplicable. Washington also contends that the search warrant which was obtained five (5) days after her arrest was obtained after her cell phone had been searched and that information obtained during the initial warrantless search was used to obtain the search warrant.

The Government asserts that the text message in question was obtained incident to Washington's arrest, as officers reasonably believed Washington was involved in drug distribution activities and that the cell phone she had with her was used to communicate with others involved in these criminal activities. The Government alleges that Melendez obtained information from Washington's cell phone after the issuance of the search warrant that Scott did not see when he searched the cell phone. The Government asserts that there was a sufficient, independent basis for the issuance of the search warrant, and police officers would have discovered the contents of the cell phone once it was searched after the issuance of the warrant.

"'Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" United States v. Fuentes, No. 09-10358, 2010 WL 724186, *2 (Mar. 3, 2010) (quoting United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002)). "Where probable cause exists for an arrest, evidence obtained during a search incident to arrest is admissible." Id. (internal citation omitted). "A search incident to arrest is . . . allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence." United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987); see also, Arizona v. Gant, ___ U.S. ___, 129 S. Ct. 1710, 1791 (2009) (reasoning that police are authorized to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search). "This exception extends to searches of 'personal property such as a wallet found on the person of the arrestee.'" United States v. Rodriguez-Alejandro, 664 F. Supp.2d 1320, 1346 (N.D. Ga. 2009) (quoting United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985)). Such a search incident to a lawful arrest "is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that Amendment." United States v. Wall, No. 08-60016-CR, 2008 WL 5381412, at *2 (S.D. Fla. Dec. 22, 2008).

A second exception is presented in those situations "when a suspect is brought to the stationhouse for booking and detention, law enforcement may remove and itemize all property found on the person or otherwise in [her] possession." Id. "One of the key government interests supporting such inventory searches is the need to account

for all property in an arrested person's possession to guard against theft or false claims as to what was taken by the police. During an inventory search, it is customary for officers to sift through bags and purses to document the contents inside." Id. (internal citations omitted).

A third exception is that "a search may be conducted without a warrant consistent with the Fourth Amendment when exigent circumstances exist, such as the threat that evidence will be destroyed." Id. (citing United States v. Reid, 69 F.3d 1109 (11th Cir. 1995)). "Such searches are justified by the futility of seeking out a judicial officer to obtain a warrant before crucial evidence is destroyed." Id.

The undersigned recognizes Scott's testimony that cell phones are commonly used communications devices, particularly in situations involving criminal activity. However, the undersigned does not find that Scott's searches of Washington's cell phone-- either at the time of her arrest, or later, when Scott was at the station house-- fit within an exception to the warrant requirement. There was no evidence at the hearing that Scott had a reasonable belief that, had he not searched Washington's cell phone without benefit of a warrant, evidence of alleged criminal activity would be destroyed. To the extent Scott could be considered conducting an inventory search, he merely had to note that Washington's cell phone was taken from the traffic stop and was being held in the station's property room. Finally, there is no evidence that exigent circumstances existed to justify Scott's warrantless searches of Washington's cell phone.

Nevertheless, the undersigned finds that evidence obtained as a result of a search of Washington's cell phone should not be subject to suppression. A review of the application for search warrant reveals that, even excising the information discovered

during Scott's search of Washington's cell phone, the search warrant's issuance is supported by probable cause.

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). "Probable cause is a fluid concept-- turning on the assessment of probabilities in particular factual contexts" and is based on the "totality of the circumstances test." Id. (internal citations and punctuation omitted).

In the search warrant application, Melendez recounted information the CI provided him, which he stated was verified and "corroborated for truthfulness through other investigative means." (Gov't's Ex. 2, p. 2). Melendez also stated that, in his experience and training, cell phones "are often used in facilitating narcotics transactions. Information pertaining to narcotics suppliers and narcotics buyers are maintained on the phones." (Id. at p. 3).

Thus, there was probable cause to believe a search of Washington's cell phone could result in obtaining evidence of criminal activity, even in the absence of information revealed by Scott's searches of this cell phone. This portion of Defendant's Motion should be denied.

AO 72A
(Rev. 8/82)

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Washington's Motions to Suppress be **DENIED**.

**SO REPORTED** and **RECOMMENDED**, this 29th day of June, 2010.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)